UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

WILLIAM JOHN DAUGHTERY,

              Plaintiff,

v.

D. WILSON, S.D.P.D., et al.,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 08cv0408-WQH (BLM)

**REPORT AND RECOMMENDATION FOR ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and GRANTING PLAINTIFF'S MOTION TO ORDER CLERK TO RETURN EXHIBITS**

[ECF Nos. 154 & 160]

      This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(c) and 72.3(f) of the United States District Court for the Southern District of California. For the following reasons, the Court **RECOMMENDS** that Defendants' Motion be **GRANTED**.

## BACKGROUND

**A.    Procedural History**

      On March 3, 2008, Plaintiff William John Daughtery, a state prisoner proceeding *pro se* and *in forma pauperis*, filed this civil rights suit against Officers Dan Wilson ("Wilson") and Esmeralda Tagaban ("Tagaban"), Sergeant Todd Griffin ("Griffin"), and Detective Roberto Lemus ("Lemus") (collectively "Defendants") under 42 U.S.C. § 1983.  ECF No. 1;

ECF No. 154-1 at 1[1].  This Court issued a scheduling order on April 17, 2008.  ECF No. 11. Thereafter, the Court granted Plaintiff's motion for leave to file an amended complaint [ECF No. 24] and Plaintiff filed his First Amended Complaint ("FAC") on June 19, 2009 [ECF No. 25].  In his FAC, Plaintiff added a claim entitled "Claim 5" against the City of San Diego and the San Diego Police Department.  ECF No. 25.  These defendants moved to dismiss the FAC and, on October 23, 2008, this Court issued a Report and Recommendation ("R&R") recommending that the motion be granted.  ECF No. 61.  On January 16, 2009, the district judge adopted this Court's R&R in its entirety and dismissed Claim 5 and the City of San Diego and the San Diego Police Department.  ECF No. 86.

In the meantime, Defendants filed a motion for summary judgment on the remaining claims against the four officers.  ECF No. 65.  Defendant Lemus also separately filed a second motion for summary judgment.  ECF No. 82.  On June 15, 2009, this Court issued an R&R recommending that Defendants' motion for summary judgment be granted and Defendant Lemus' motion be denied.  ECF No. 109.  The district judge adopted the R&R in its entirety on August 18, 2009.  ECF No. 118.  However, in the same order, the district judge allowed Plaintiff leave to revive his case by filing a motion to amend his complaint to raise a claim against the four Defendants that was similar to a portion of Claim 5 that had been dismissed as to the City of San Diego and the San Diego Police Department.  Id.

Plaintiff filed his motion to amend and, subsequently, filed a proposed second amended complaint and then an "alternate proposed Second Amended Complaint."  ECF Nos. 124 & 125.  The alternate proposed Second Amended Complaint contained a second, entirely new claim.  ECF No. 125.  On October 26, 2009, the district judge granted Plaintiff's motion and deemed the alternate proposed Second Amended Complaint (hereinafter "SAC") to be the operative pleading.  ECF No. 126.

///

///

---

[1] Defendants listed their full names and titles, which Plaintiff did not provide in his original complaint, in the memorandum accompanying their recent motion for summary judgment.

08cv0408-WQH (BLM)

On December 2, 2009, Defendants filed a motion to dismiss the SAC.[2]  ECF No. 128. On April 14, 2010, this Court issued an R&R recommending that Defendants' motion to dismiss the SAC be granted in part and denied in part.  ECF No. 136.  This Court recommended that Plaintiff's claim that he had been denied medical care should not be dismissed, but Plaintiff's claim regarding Defendants' actions at his state court trial should be dismissed.  Id.  In addition, this Court raised *sua sponte* the issue that Plaintiff's claims against Defendants in their official capacities were inappropriate, and recommended those claims be dismissed as well.  Id.  On June 25, 2010, the district judge issued an order adopting this Court's R&R in its entirety.  ECF No. 143.

On July 7, 2010, Defendants filed an answer to Plaintiff's Second Amended Complaint.  ECF No. 144.  On January 7, 2011, Defendants filed a motion for summary judgment, or in the alternative, partial summary judgment, as to Plaintiff's remaining claim. ECF No. 154 ("Defs.' Mem").  Plaintiff filed a timely opposition [ECF No. 159], to which Defendants timely replied [ECF No. 167]  Upon realizing that, since the filing of this third motion, neither the Court nor Defendants had informed Plaintiff of the requirements for opposing Defendants' Motion for Summary Judgment pursuant to Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988) and Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998) (en banc), the Court, in an abundance of caution, once again reminded Plaintiff of the requirements for opposing a summary judgment motion and provided him with an additional opportunity to oppose Defendants' motion.  ECF No. 170.  On May 25, 2011, Plaintiff filed an affidavit and declaration in opposition.  ECF No. 171 ("Pl.'s Aff.").  Defendants filed a sur-reply on June 1, 2011.  ECF No. 172.

**B.    Factual Background**

On the evening of March 9, 2006, Detective Roberto Lemus was working undercover as part of a buy/bust program in the area of 1400 J Street in San Diego, California.  Decl.

---

[2]  Later the same day, Defendants filed an amended motion to dismiss the SAC, which corrected a typographical error in the hearing date.  ECF No. 129.

of Roberto Lemus Supp. Defs.' Mot. for Summ. J.[3] ("Lemus Decl.") ¶ 1.  Lemus made contact with an individual later identified as Plaintiff, who sold him a piece of off-white "rock-like" substance later identified as cocaine base in exchange for a pre-recorded twenty dollar bill.  Id. ¶¶ 2-3.  After completing the exchange, Lemus and Plaintiff walked away from each other in opposite directions.  Id. ¶ 4; Decl. of Todd Griffin Supp. Defs.' Mot. for Summ. J. ("Griffin Decl.") ¶ 4.  As he was walking away from Plaintiff, Lemus saw Plaintiff place something in his mouth.  Lemus Decl. ¶ 4.  Lemus then used the one-way transmitter he was wearing to give the other members of his team a physical description of Plaintiff and a pre-planned signal indicating the transaction was complete and that officers should take Plaintiff into custody.  Id. ¶¶ 2, 4; Griffin Decl. ¶¶ 2, 4; Decl. of Dan Wilson Supp. Defs.' Mot. for Summ. J. ("Wilson Decl.") ¶ 3; Decl. of Esmeralda Tagaban Supp. Defs.' Mot. for Summ. J. ("Tagaban Decl.") ¶ 3.  Griffin monitored the interaction from a vehicle parked a short distance away.  Griffin Decl. ¶ 2.

Upon hearing the pre-planned signal, Wilson drove to the 1500 block of J Street and observed a male who matched the description given by Lemus (later identified as Plaintiff).  Wilson Decl. ¶ 4. Wilson pulled his vehicle in front of Plaintiff, blocking his path, got out, and ordered Plaintiff to stop.  Id. ¶ 5.  Plaintiff walked around the front of the vehicle and began walking faster as Wilson approached.  Id. ¶ 5; Griffin Decl. ¶ 5.  Plaintiff appeared to be chewing on something.  Wilson Decl. ¶ 5; Griffin Decl. ¶ 5.  Believing Plaintiff was transporting narcotics in his mouth and attempting to chew and swallow them, Wilson took Plaintiff to the ground onto his stomach and ordered him to spit out what he had in his mouth.  Wilson Decl. ¶ 5.  Plaintiff states that in so doing, Wilson repeatedly slammed his forehead into the concrete causing a large bump and applied a "strangle/chokehold" to his neck, which caused a spinal injury.  Pl.'s Aff. ¶ A.  Both of Plaintiff's hands were under his body as he lay on the ground.  Id.; Griffin Decl. ¶ 5; Tagaban Decl. ¶ 6.

---

[3]  Unless otherwise noted, all further references to Defendants' motion for summary judgment, and all documents attached thereto, refer to the motion filed on January 7, 2011 [ECF No. 154], not the one filed on November 18, 2008 [ECF No. 65] or the one filed by Lemus on January 9, 2009 [ECF No. 82].

Officer Tagaban arrived on the scene, turned the spotlight on her patrol vehicle on Wilson and Plaintiff, and ran to assist Wilson.  Tagaban Decl. ¶ 5.  Fearing that Plaintiff might be attempting to reach for a weapon underneath him, Tagaban struck Plaintiff's left shoulder area with her flashlight as a distraction technique in an attempt to gain control of his hands, while ordering him Plaintiff to remove his hands from underneath his body and spit out the contents of his mouth.  Id. ¶¶ 5-6; see also Wilson Decl. ¶ 6 and Griffin Decl. ¶ 6.  When Plaintiff failed to comply, Tagaban applied additional distraction blows with her flashlight until Plaintiff eventually brought his hands out from underneath his body.[4] Tagaban Decl. ¶6.  At some point during the altercation, Plaintiff contends that either Tagaban stepped on his scrotum or Wilson kneed him in the scrotum.  Pl.'s Aff. ¶ B.  He also states that he eventually lost consciousness as a result of the beating.  Id.  This fact is disputed, as Griffin, Wilson, and Tagaban all state that during the entire time they were attempting to gain Plaintiff's compliance, he was moving continuously, his eyes were open, and he was breathing heavily.  Griffin Decl. ¶ 7; Wilson Decl. ¶ 7; Tagaban Decl. 7.  None of these officers observed Plaintiff lose consciousness nor did they hear him complain at this time of being injured or in pain.  Griffin Decl. ¶ 7; Wilson Decl. ¶ 7; Tagaban Decl. 7.

Once he was handcuffed, Plaintiff spit out a chewed up clear plastic bindle containing a white substance, later confirmed to be cocaine base.  Wilson Decl. ¶ 8; Tagaban Decl. ¶ 8; Griffin Decl. ¶ 8.  Griffin picked up Lemus and drove him by Wilson's patrol car, where Plaintiff was detained, and Lemus positively identified Plaintiff as the individual who sold him narcotics.  Griffin Decl. ¶ 9; Lemus Decl. ¶ 5.  Lemus and Griffin state that they did not observe any visible injuries to Plaintiff as he stood by the vehicle.  Lemus Decl. ¶ 5; Griffin Decl. ¶ 9.  Wilson and Tagaban assert that they also did not observe any visible injuries to Plaintiff and that Plaintiff did not complain at this time of being injured, in pain, or in need of medical attention.  Wilson Decl. ¶ 9; Tagaban Decl. ¶ 9.

Wilson then transported Plaintiff to Central Division for booking.  Wilson Decl. ¶ 10;

---

[4] Plaintiff agrees that Tagaban struck him repeatedly in the shoulder with her flashlight, and also states that Tagaban struck him in the head.  Pl.'s Aff. ¶ B.

Lemus Decl. ¶ 6.  At no time during the drive did Plaintiff complain to Wilson of being injured, in pain, or in need of medical treatment.  Id.  Once at booking, Plaintiff was placed in a holding cell while the officers completed paperwork.  Wilson Decl. ¶ 11; Lemus Decl. ¶ 7; Tagaban Decl. ¶ 10; Griffin Decl. ¶ 11.  All of the officers were able to observe Plaintiff in the holding cell from the location where each of them was completing paperwork, and all note that Plaintiff did not appear to have any visible injuries and, in fact, walked around and moved his shoulders back and forth without any apparent pain or discomfort.  Wilson Decl. ¶ 11; Lemus Decl. ¶ 7; Tagaban Decl. ¶ 10; Griffin Decl. ¶ 11.  Plaintiff also did not complain of being injured or in pain, and did not ask any of the officers (including Griffin, the Sergeant on duty) for medical treatment.  Wilson Decl. ¶ 11; Lemus Decl. ¶ 7; Tagaban Decl. ¶ 10; Griffin Decl. ¶¶ 11-12.  Once Plaintiff was booked, Griffin had no further contact with him.  Griffin Decl. ¶ 13.

Lemus interviewed Plaintiff in the holding cell while he was being held at Central Division.  Lemus Decl. ¶ 8.  At no time during the interview did Plaintiff complain of being injured, in pain, or in need of medical care.  Id.  To the contrary, Lemus reports that Plaintiff did not appear to have any visible injuries, was able to understand his questions, did not appear confused or in pain, had clear and focused eyes, and was able to speak clearly.[5]  Id.  This interview was Lemus's last contact with Plaintiff.  Id. ¶ 9.

Wilson and Tagaban then transported Plaintiff to Central Jail.  Wilson Decl. ¶ 12.  During the drive, Plaintiff did not complain of being injured, in pain, or in need of medical treatment.  Id.; Tagaban Decl. ¶ 11.  Upon arriving at County Jail, Plaintiff was seen by the admitting nurse and complained for the first time of pain in his left shoulder.  Wilson Decl. ¶ 13; Tagaban Decl. ¶ 12.  Tagaban observed Plaintiff throwing his shoulders up several times to keep his jacket from sliding down his arms without any complaint or sign of pain.  Tagaban Decl. ¶ 12.  Wilson observed Plaintiff removing his jacket and shirt using quick

---

[5]  Lemus notes that prior to becoming a police officer, he served for twenty years as a Special Operations Independent Duty Corpsman.  Lemus Decl. ¶ 11.  As part of his regular duties, he "conducted routine sick call and provided emergency trauma care to military personnel."  Id.  He also states that he has "experience in detecting and treating injured individuals."  Id.

motions—manipulating his left shoulder around without any apparent trouble or pain—and noted that he did not see any signs of swelling or bruising on Plaintiff's shoulder. Wilson Decl. ¶ 13. Wilson saw the admitting nurse touch Plaintiff's shoulder several times. <u>Id.</u> Both Wilson and Tagaban state that the admitting nurse did not inform them that Plaintiff had any injuries for which he needed to be treated by a doctor. Wilson Decl. ¶ 13; Tagaban Decl. ¶ 12. After being examined by the admitting nurse, Plaintiff stated that he was suicidal and homicidal. Wilson Decl. ¶ 13; Tagaban Decl. ¶ 12. For this reason, Plaintiff was refused admittance into the jail and it was requested that the officers clear him through County Mental Health ("CMH"). Wilson Decl. ¶ 13; Tagaban Decl. ¶ 12.

Wilson and Tagaban transported Plaintiff to CMH. Wilson Decl. ¶ 14; Tagaban Decl. ¶ 13. During the drive, Plaintiff did not complain of being injured, in pain, or in need of medical treatment. Wilson Decl. ¶ 14; Tagaban Decl. ¶ 13. At CMH, Plaintiff complained only of shoulder pain and a nurse moved Plaintiff's clothing so that she could view his left shoulder area. Tagaban Decl. ¶13. Plaintiff states that the nurse said in the presence of Wilson and Tagaban that Plaintiff had "bruises (red marks)" on his back. Pl.'s Aff. ¶¶ AA, BB. Tagaban walked over and looked at the area and "observed two very faint red marks on his shoulder area, one measuring approximately two inches in length and the second approximately three inches in length." Tagaban Decl. ¶ 13. She did not see any swelling or deep bruising on Plaintiff's left shoulder. <u>Id.</u> A physician (Dr. Ramsey) also was present during the examination. <u>Id.</u>; Wilson Decl. ¶ 14. Wilson and Tagaban heard Plaintiff deny being suicidal to Dr. Ramsey, which resulted in Plaintiff being cleared for incarceration. Wilson Decl. ¶ 14; Tagaban Decl. ¶ 13. Neither the nurse nor Dr. Ramsey informed Wilson or Tagaban that Plaintiff was injured and in need of treatment by a medical doctor. Wilson Decl. ¶ 14; Tagaban Decl. ¶ 13. However, Plaintiff states that he begged Dr. Ramsey for the medication that the doctor promised but did not dispense.[6] Pl.'s Aff. ¶¶ AA, BB.

---

[6] Though Plaintiff apparently wants the Court to infer that Dr. Ramsey promised him pain medication, Plaintiff admits in his Opposition that the promised medication was Trazodone, which Plaintiff claimed he had been taking prior to the March 2006 incident to help him sleep (i.e. not for pain related to injuries incurred

Wilson and Tagaban then transported Plaintiff back to Central Jail and both report that, again, Plaintiff did not complain of being injured, in pain, or in need of medical treatment during the trip.  Wilson Decl. ¶ 14; Tagaban Decl. ¶ 13.  When they arrived, Plaintiff was seen by an admitting nurse, who did not inform Wilson or Tagaban that Plaintiff had any injuries or was in need of medical treatment.  Wilson Decl. ¶ 15; Tagaban Decl. ¶ 14.  However, both officers report that when he realized he was going to be admitted into Central Jail, Plaintiff became irate, cursed the admitting nurse, and claimed to still be suicidal.  Wilson Decl. ¶ 15; Tagaban Decl. ¶ 14.  Because the jail did not have enough "safety cells" for suicidal individuals, the nurse rejected Plaintiff for admittance. Wilson Decl. ¶ 15; Tagaban Decl. ¶ 14.

As an alternative, Wilson and Tagaban transported Plaintiff to Vista Jail.  Wilson Decl. ¶ 16; Tagaban Decl. ¶ 15.  During the drive, Plaintiff did not complain of being injured, in pain, or in need of medical treatment.  Wilson Decl. ¶ 16; Tagaban Decl. ¶ 15.  Plaintiff did complain to the admitting nurse at Vista jail of having pain in his left shoulder, though it did not appear to Wilson or Tagaban that he suffered any difficulty or pain in removing his jacket and shirt before the nurse's examination.  Wilson Decl. ¶ 17; Tagaban Decl. ¶ 16. They did observe him showing slight discomfort when putting his shirt and jacket back on, but the admitting nurse did not indicate that Plaintiff had any injuries for which he required medical treatment.  Wilson Decl. ¶ 17; Tagaban Decl. ¶ 16.  To the contrary, she cleared Plaintiff as medically fit for confinement.  Wilson Decl. ¶ 17; Tagaban Decl. ¶ 16.  Plaintiff was booked into Vista Jail, at which point Wilson and Tagaban had no further interactions with him.  Wilson Decl. ¶ 21; Tagaban Decl. ¶ 20.

### EVIDENTIARY OBJECTIONS

Plaintiff attached numerous exhibits to his Opposition.  <u>See</u> ECF No. 159 ("Pl.'s Opp'n"), Exs. A-Z. Defendants object to all of these exhibits being considered by the Court on the grounds that Plaintiff failed to authenticate any of the exhibits and, even if he had

on March 9, 2006).  <u>See</u> Pl.'s Opp'n at 4.

done so, they all contain inadmissable hearsay.  Defs.' Reply at 2-3.

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010); see also Celotex Corp., 477 U.S. at 324 (the nonmoving party need not produce evidence in a form that would be admissible at trial, but must rely on the kinds of evidentiary materials listed in Rule 56).  The party seeking admission of the evidence bears the burden of proof to show its admissibility.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 385 (9th Cir. 2010).  Further, "[a]uthentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002) (quoting Fed. R. Civ. P. 901(a)).  The Ninth Circuit repeatedly has held that trial courts may not consider unauthenticated documents in ruling on a motion for summary judgment.  Id.

This Court has reviewed all of the exhibits attached to Petitioner's Opposition.  It appears that the very first page of Exhibit E, which is entitled "San Diego County Sheriff's Department Mugshot Profile/Facecard" is the only properly authenticated exhibit.  This page contains a seal from the San Diego County Sheriff's Department certifying it as a true and correct copy, which also contains a signature and date.  See Pl.'s Opp'n, Ex. E at 1. Therefore, the Court **OVERRULES** Defendants' objection to Exhibit E, page 1.  See Fed. R. Evid. 901(b)(7) and 902(4).

The remainder of Defendants' objections to Plaintiff's exhibits are **SUSTAINED** as Plaintiff has failed to authenticate the exhibits in accordance with the Federal Rules of Evidence.  Because Plaintiff has not adequately authenticated them, the remaining exhibits cannot be considered by this Court.[7]  Orr, 285 F.3d at 773.  In addition, the Court finds that

---

[7]  While Rule 56(d) allows a court to consider the nonmovant's inability to gather evidence when considering a motion for summary judgment, Plaintiff has not stated an inability to gather evidence.  Rather, Plaintiff has provided exhibits but failed to authenticate any of them, and Plaintiff provides no explanation

the majority of these documents contain inadmissible hearsay and/or are irrelevant to Plaintiff's deliberate indifference claim.  Notwithstanding these evidentiary problems, in an abundance of caution, the Court has reviewed all of the documents.  Even if the documents were admissible, none of them would alter the Court's conclusion that Plaintiff's deliberate indifference claim against Defendants fails.

## **LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party has the initial burden of demonstrating that summary judgment is proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party to provide evidence beyond the pleadings to show that summary judgment is not appropriate.  Id. at 322-24.  The opposing party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  "A fact or issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson, 477 U.S. at 248).  The court may not weigh evidence or make credibility determinations on a motion for summary judgment; rather, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255; Rezner v. Bayerische Hypo-Und Vereinsbank AG, 630 F.3d 866, 871 (9th Cir. 2010).

Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States.  See 42 U.S.C. § 1983; Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31

for this failure.

(1986).  A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  <u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988).

## DISCUSSION

### A.   Plaintiff's Claim For Failure to Provide Medical Care

Plaintiff's sole remaining claim is that Defendants violated his Fourteenth Amendment rights when they failed to provide him with medical care for his serious medical needs.  SAC at 7; ECF No. 143 at 5 (district judge's order adopting this Court's report and recommendation).  The Due Process Clause of the Fourteenth Amendment requires state governments to provide medical care to individuals injured while being apprehended by the police.  <u>City of Revere v. Mass. General Hosp.</u>, 463 U.S. 239, 244 (1983).  While the Supreme Court has not clearly articulated the states' due process obligations to pretrial detainees, the rights of such an individual "are at least as great as the Eighth Amendment protections available to a convicted prisoner."  <u>Id.</u> (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n. 16 (1979)).  In practice, despite the Supreme Court's suggestion that the Eighth Amendment dictates only a minimum standard of care for pretrial detainees, both the Supreme Court and the Ninth Circuit consistently have applied the same standard to both types of cases.  <u>See Simmons v. Navajo Cnty., Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010) ("Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, [citation omitted], we apply the same standards in both cases").  Specifically, these courts have held that an official violates a pretrial detainee's constitutional rights if he or she acts with deliberate indifference to the pretrial detainee's serious medical needs.  <u>See Clouthier v. Cnty. of Contra Costa</u>, 591 F.3d 1232, 1241-1243 (9th Cir. 2010).

### 1.     Serious Medical Need

The first question is whether any of Plaintiff's injuries rise to the requisite level of seriousness to support a constitutional claim.  "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain'."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)), overruled on other grounds by WMX Tech., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Examples of sufficiently serious medical needs are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  Id. at 1059-60 (citations omitted).

Plaintiff alleges in his SAC that he sustained the following injuries during the March 6, 2009 arrest: "(1) chronic migraine headache, (2) spinal degeneration, (3) backache, (4) limited use of left arm (torn labrum/rotator cuff), (5) non-malignant testicular mass (left teste) with chronic pain, (6) fractured left lamina papyracea (skull fracture), (7) irritable bowel syndrome/irregularity, [and] (8) clinical depression[] (untreated at present)."  SAC at 6.  However, Plaintiff presents no authenticated, admissible evidence that these injuries actually occurred, that they resulted from the March 6, 2009 incident, or that he notified medical personnel of these injuries after his arrest.  Without any evidence to support his claim that he actually sustained these injuries as a result of the arrest, none of the above claimed injuries can be used to satisfy the serious medical need requirement of Plaintiff's Fourteenth Amendment claim.  See Celotex, 477 U.S. at 323.

Defendants, on the other hand, have presented considerable admissible evidence that these injuries did not occur as a result of Plaintiff's March 2009 arrest.  Most notably, Defendants' medical expert explains in his declaration and attached report that Plaintiff's medical records show that Plaintiff's left lamina papyracea actually was fractured over two years before Plaintiff's arrest.  Decl. of Gary M. Vilke, M.D., FACEP, FAAEM Supp. Defs.' Mot. for Summ. J. ("Vilke Decl.") ¶ 12 and Ex. 2 at 5.  Likewise, Dr. Vilke opined that, assuming

Plaintiff has a left rotator cuff injury[8], the arrest "mechanism" reported by the police as well as Mr. Daughtery is not the hyperextension type of injury that typically causes a rotator cuff tear.  Id. ¶ 10 and Ex. 2 at 4.  A rotator cuff injury also is painful, and thus Dr. Vilke opined that it is unlikely the officers caused this injury because Dr. Ramsey (as well as the officers) reported that Plaintiff was moving his extremities without difficulty and did not appear to be in pain or acute distress.  Id. ¶ 10 and Ex. 2 at 4-5.  Dr. Vilke also explains that chronic migraine headaches, spinal degeneration, and irritable bowel syndrome/irregularity are chronic conditions, none of which result in clinical signs or symptoms that could be recognized by a law enforcement officer.  Id. ¶¶ 7, 8, 13 and Ex. 2 at 3, 6.  A person suffering from one of these conditions would have to complain specifically about his symptoms (e.g. "my head hurts") in order to make someone aware of the pain.  Id.  All four officers state in their declarations that Plaintiff never complained to them of pain, Plaintiff does not allege in his SAC that he complained of headache, neck or back pain, or abdominal cramping or diarrhea, and Dr. Vilke notes that there are no reports of Plaintiff having made of these complaints in the medical and arrest records he reviewed.  See Wilson Decl. ¶¶ 9-16, Tagaban Decl. ¶¶ 9-15, Lemus Decl. ¶¶ 7-8, Griffin Decl. ¶¶ 11-12, SAC, Vilke Decl. ¶¶ 7, 8, 13 and Ex. 2 at 3, 6.  Dr. Vilke further highlights that none of the eight injuries or conditions of which Plaintiff complains were detected by the medical personnel who examined Plaintiff.  Vilke Decl. ¶ 16 and Ex. 2 at 6-7.  Plaintiff was seen at least three times during the course of his arrest by various medical personnel including intake nurses, the examining nurse at County Mental Health, and the examining doctor at County Mental Health, Dr. Ramsey.  Wilson Decl. ¶¶ 13-17.  None of these medical personnel recorded these injuries or any symptoms indicating that Plaintiff may be suffering from these injuries.  See Vilke Decl. ¶¶ 7-16 and Ex. 2 at 3-7.  Id.  Thus, there is no evidence establishing that any of the injuries alleged by Plaintiff in the SAC were caused by his March 6, 2009 arrest.

---

[8]  Dr. Vilke notes that he could not find an imaging study in the records to confirm this diagnosis. Vilke Decl. ¶ 10 and Ex. 2 at 4.

In his Opposition, Plaintiff clarifies that his claim is premised on the following injuries: 1) a bump on his head, possible concussion, and loss of consciousness caused by being brought to the ground and choked by Wilson; and 2) shoulder pain and bruising caused when Tagaban struck him on the shoulder with her flashlight.  Pl.'s Opp'n at 3-5. Accordingly, the Court will evaluate each of these alleged injuries.

### a.   Plaintiff's Head Injury and Loss of Consciousness

To establish his claim that he suffered a head injury and loss of consciousness, Plaintiff presents photographs of himself, purportedly showing a bump on his forehead, taken shortly after the events in question.  Pl.'s Opp'n, Exs. E and F.  Additionally, Plaintiff attaches Lemus's police report wherein Lemus transcribed his interview with Plaintiff the night of the arrest.  Id., Ex. I.  During the interview, Plaintiff responded to Lemus's questioning about whether Plaintiff was selling rock (cocaine) by stating "Well I don't remember because I was chocked (sic) unconscious and I don't remember much."  Id. Plaintiff argues that this exchange shows that (1) Lemus knew Plaintiff was choked unconscious and (2) Lemus should have summoned medical care because a reasonable person would recognize that loss of consciousness and memory indicates an egregious concussion or other serious harm.  Id. at 5.  Finally, Plaintiff states in his affidavit that Wilson slammed his forehead into the concrete "causing large 'bump'" and that the "shock/pain along with beating caused unconsciousness."  Pl.'s Aff. ¶¶ A, B.

As explained in the Evidentiary Objections section above, the Court may not consider Lemus's report because Plaintiff failed to authenticate it.  Even if he had provided proper authentication, the statement Plaintiff seeks to rely on to prove that Plaintiff did, in fact, lose consciousness and that Lemus knew it, is hearsay, not subject to any exception.  See Fed. R. Evid. 801.  As such, the Court cannot consider it as proof of the matter asserted.[9]

---

[9]  Even if Plaintiff's statement to Lemus was admissible, it would not create a triable issue of fact as to whether Plaintiff had a serious medical need because, as discussed in this section, there is no evidence that Plaintiff told any of the medical personnel about a loss of consciousness or that such a condition existed.

In regard to the photos, the Court concluded in the Evidentiary Objections section of this report that only the first page of Exhibit E is admissible.  The photographs on this mugshot profile/facecard show a lighter patch of skin on the left side of Plaintiff's forehead, which may be a bump, though it is difficult to tell by looking at the photographs.  See Pl.'s Opp'n, Ex. E at 1.  The facecard indicates that the photographs were taken on March 10, 2006 at 1:31 (it does not indicate a.m. or p.m.).  Id.

Even assuming the photograph does depict a bump on Plaintiff's head, Plaintiff presents no evidence that a forehead knot constitutes a serious medical need.  As previously noted, serious medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." McGuckin, 974 F.2d at 1059-60 (citations omitted).  Plaintiff apparently did not find his injury worth of comment or treatment because nowhere in his affidavit does Plaintiff claim that he told any of the officers, nurses, or doctors that his head hurt, that he lost consciousness, and/or that he needed treatment for his head.  Likewise, Defendants' declarations make clear that none of the medical professionals who examined Plaintiff noted the existence of a bump on his head or any signs of a recent loss of consciousness.  See Wilson Decl. ¶¶ 13-15, 17, Tagaban Decl. ¶¶ 12-14, 16, Vilke Decl. ¶ 5-16.  While Plaintiff takes great pains to note that he begged Dr. Ramsey for the medication he claims Dr. Ramsey promised him (Pl.'s Aff. ¶ AA), even Plaintiff admits in his Opposition that the promised medication was Trazodone, which Plaintiff claimed he had been taking prior to the March 2006 incident to help him sleep (i.e. not for pain related to injuries incurred on March 9, 2006) (see Pl.'s Opp'n at 4).  Plaintiff also does not indicate anywhere what further significant injury did or even could have resulted from the failure to treat his head bump, nor does he submit evidence of any such

///

///

///

lingering injuries.[10]  See McGuckin, 974 F.2d at 1059 ("A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain'"); see also Porter v. Goord, 2009 WL 2180580, at *12 (W.D.N.Y. Jul. 22, 2009) (finding no serious medical condition where inmate complained only of a bump on his head; nurse found dime-sized bump on head, quarter-inch lip laceration, and one-inch laceration on neck; and inmate did not allege that he suffered further significant pain or injury or that injuries did not heal as a result of delayed or denied treatment).  Thus, the Court finds that Plaintiff has not set forth any specific facts or evidence demonstrating that his alleged head injury constituted a sufficiently serious medical need to justify a reasonable jury returning a verdict in his favor.  Anderson, 477 U.S. at 256; Villiarimo, 281 F.3d at 1061.  Accordingly, Plaintiff's claim of serious medical injury cannot be maintained on these grounds.

### b.    Plaintiff's Shoulder Injury

Plaintiff also claims he suffered an injury to his left shoulder, marked by pain and red marks or bruises.  Pl.'s Opp'n at 3-4.  However, at no point in his affidavit does he state that this injury was visible, that he complained of left shoulder pain to any of the officers prior to the time he was seen by the County Jail intake nurse, or that he exhibited any signs

---

[10]  In his Opposition, Plaintiff does reference "medical proof submitted previously" and cites to Document No. 119-3.  Pl.'s Opp'n at 5.  While the Court makes no ruling about the admissibility of this evidence, a review of this docket entry reveals that these medical records do nothing to support Plaintiff's claims.  The records do not document any complaints by Plaintiff that he had a bump on the left side of his head, lost consciousness, or required medical attention for a head injury.  ECF No. 119-3.  In July of 2007, Plaintiff claimed that he was beat up by officers the year before and suffered injury to his right eye and left shoulder.  Id.  However, the photos Plaintiff now seeks to rely on show that the bump, if any, is over his left eye.  See Pl.'s Opp'n, Ex. E.  The only other references in the medical records to Plaintiff's head were complaints of headaches that he suffered regularly since at least 2004, which were determined to be the result of migraine headaches, not trauma, and treated accordingly.  Id.  This is in keeping with Plaintiff's allegation in his SAC that he suffers migraine headaches.  And, the records do not demonstrate any verifiable link between Plaintiff's current complaints about a head bump and the migraine headaches.  Id.  There are records of a CT scan having been performed, but in keeping with the conclusion of Defendants' expert, the scan was a comparison study with a CT performed years before the incident (December 24, 2003), which noted that the fracture to Plaintiff's left lamina papyracea was unchanged.  Id.; C.f. Vilke Decl. ¶ 12.  The results of the CT scan otherwise indicated "no acute intracranial findings."  ECF No. 119-3.  In reference to the alleged shoulder injury discussed more thoroughly below, staff notes indicate that Plaintiff spent a good portion of March 10, 2006 lying on his left shoulder (the one he claims the officers injured) without any signs of pain.  Id.  Notably, no significant pain medication was ever prescribed for either Plaintiff's head or shoulder complaints.  Id.

that he was suffering from substantial pain in his left shoulder.  See Pl.'s Aff.  As noted above, a medical need is serious if a reasonable patient would find it worthy of comment or treatment, it significantly affects the individual's daily activities, or the individual suffers chronic and substantial pain.  McGuckin, 974 F.2d at 1059-60.  Plaintiff does not claim that he told any of the officers his shoulder hurt or that he wanted medical treatment for it,  that he was unable to do any activities or comply with any orders because of his shoulder injury, or that he exhibited obvious signs of substantial pain.  On the other hand, all four officers affirmatively state in their declarations that Plaintiff did not complain of shoulder pain or ask for medical treatment prior to when he complained to the County Jail intake nurse.  Wilson Decl. ¶¶ 9-12, Tagaban Decl. ¶¶ 9-11, Lemus Decl. ¶¶ 7-8, Griffin Decl. ¶¶ 11-12.  All four also observed Plaintiff moving his shoulder around without exhibiting any obvious signs of pain or discomfort during this time frame.  Wilson Decl. ¶¶ 9-12, Tagaban Decl. ¶¶ 9-11, Lemus Decl. ¶¶ 7-8, Griffin Decl. ¶¶ 11-12.  As such, there is no evidence that Plaintiff's shoulder injury immediately presented as a serious medical need.

After being driven to booking, waiting during the booking and interviewing process, and then being driven to County Jail, Plaintiff finally complained for the first time of left shoulder pain.  See Tagaban Decl. ¶ 12.  The County Jail intake nurse examined him, but did not indicate that he had an injury that required treatment by a doctor.  Id.  As set forth above, Plaintiff was seen by three more nurses and one doctor that day, none of whom determined that his complaints of shoulder pain warranted pain medication, imaging studies, a sling, or even ice.  Id. ¶¶ 13, 14, & 16; see also Vilke Decl. ¶ 10 & 16.  Plaintiff offers no admissible evidence to refute any of these facts nor does he point to any evidence that medical personnel later determined that a more acute injury was overlooked by these nurses and Dr. Ramsey or that Plaintiff's condition subsequently deteriorated.  Having shown only that he had shoulder pain and red bruises, neither of which required any form of treatment immediately or later, the Court concludes that Plaintiff fails to demonstrate that his left shoulder injury constituted a serious medical need.  See McGuckin, 974 F.2d at 1059-60.  Furthermore, as will be discussed supra, even if Plaintiff's left shoulder injury

did rise to the level of a serious medical need, there is no evidence that the officers knew, or should have known, of the injury prior to Plaintiff complaining of it to the intake nurse, or that the officers had reasonable grounds not to subsequently rely on the judgments of four medical professionals that Plaintiff did not require treatment.

### 2.   Deliberate Indifference

Though the Court concludes that Plaintiff has failed to show he was suffering from a serious medical need in March 2006, the Court nonetheless considers whether Plaintiff has satisfied the second prong of the test, which requires Plaintiff to show that each defendant was deliberately indifferent to his serious medical need.  See Estelle, 429 U.S. at 104; Clouthier, 591 F.3d at 1241-1243.  This prong "is satisfied by showing (a) a purposeful act or failure to respond to a [detainee's] pain or possible medical need and (b) harm caused by the indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Non-medical personnel, such as Defendants, are deliberately indifferent to serious medical needs when they intentionally deny or delay access to medical care, or when they intentionally interfere with treatment once it has been prescribed.  Estelle, 429 U.S. at 104-05.  Inadvertent or negligent failure to provide adequate medical care are insufficient to establish a claim of deliberate indifference.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Jett, 439 F.3d at 1096. Moreover,

> "A defendant is liable for denying needed medical care only if he 'knows of and disregards an excessive risk to inmate health and safety.' []  In order to know of the risk, it is not enough that the person merely 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [ ] he must also draw that inference.' ... But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction."

Lolli v. Cnty of Orange, 351 F.3d 410, 418-419 (9th Cir. 2003) (quoting Gibson v. Cnty of Washoe, 290 F.3d 1175, 1187-88 (9th Cir. 2002)) (reversing grant of summary judgment in favor of officers who knew detainee was diabetic and needed food, yet denied him food or medical attention).  Because the subjective awareness of each Defendant is in question, it is useful to consider them separately.

### a.   <u>Detective Lemus</u>

Lemus participated in the buy-bust operation as an undercover agent.  According to his declaration, he purchased drugs from Plaintiff, then walked away, alerting the other officers that the exchange had taken place.  Lemus Decl. ¶¶ 2-4.  Lemus did not witness Plaintiff's arrest by Tagaban and Wilson.  <u>Id.</u> ¶5.  After the arrest, Lemus was driven by the location of the arrest, and identified Plaintiff.  <u>Id.</u>  Lemus states that he did not observe any injuries on Plaintiff after the arrest.  <u>Id.</u>  Lemus did not see Plaintiff again until Plaintiff was placed in a holding cell at Central Division.  <u>Id.</u> ¶¶ 6-7.  There, Lemus observed Plaintiff while Lemus completed paperwork, but Lemus did not notice any visible injuries at this time either.  <u>Id.</u> ¶ 7.  Rather, he noted that Plaintiff was "walking around and moving his shoulders back and forth without any apparent pain or discomfort."  <u>Id.</u>  Lemus asserts that Plaintiff did not complain of pain or injury, nor did Plaintiff ask for medical treatment.  <u>Id.</u>  Lemus's final interaction with Plaintiff was an interview in the holding cell.  <u>Id.</u> ¶ 8.  Lemus asserts that Plaintiff did not appear to be in pain or confused during the interview, that his eyes were "clear and focused" and that Plaintiff was able to speak clearly.  <u>Id.</u>  After this interview, Lemus and Plaintiff had no further contact.  <u>Id.</u> ¶ 9.

Though Plaintiff alleges that he informed Lemus of his injuries (<u>see</u> SAC at 6), Plaintiff presents no admissible evidence to contradict Lemus's sworn declaration.  Rather, Plaintiff asserts that Lemus should have known he was injured, as Lemus witnessed Plaintiff being struck by Tagaban and Wilson.  Pl.'s Opp'n at 5.  However, according to Lemus' sworn declaration, Lemus did not witness Plaintiff's arrest.  Lemus Decl. ¶ 5.  Plaintiff presents no evidence to refute Lemus's account.  Plaintiff also does not allege or prove that Lemus observed his shoulder bruising.  Given that the only admissible evidence before the Court shows that Plaintiff did not complain of shoulder pain to Lemus and that the bruising was not discovered until after Lemus's last interaction with Plaintiff, there is no basis for finding that Lemus was deliberately indifferent to Plaintiff's alleged serious medical needs.

Furthermore, even if Plaintiff told Lemus that he lost consciousness or Lemus witnessed a bump on Plaintiff's forehead, Plaintiff has not demonstrated that any harm

whatsoever resulted from Lemus's failure to seek immediate medical care for Plaintiff. Jett, 439 F.3d at 1096.  Soon after Lemus last saw Plaintiff, a nurse examined Plaintiff and determined that he was not in need of any medical care.  See Wilson Decl. ¶ 13, Tagaban Decl. ¶ 12.  Three more nurses and a doctor subsequently agreed with this conclusion and none of them even noted the presence of a bump on Plaintiff's head.[11]  See Wilson Decl. ¶¶ 13-15, 17, Tagaban Decl. ¶¶ 12-14, 16.  And, Plaintiff has not shown that any subsequent harm resulted from any of these individuals' failure to treat his head bump. See, e.g., Anthony v. Dowdle, 853 F.2d 741, 743 (9th Cir. 1988) (finding no deliberate indifference where plaintiff's injuries were not obvious to the defendants, defendants noticed no outward manifestations of the seriousness of plaintiff's internal injuries, plaintiff did not continue to complain of pain, and plaintiff did not become aware of permanent injuries resulting from accident until nearly two years later).  Thus, the record is utterly devoid of evidence to support Plaintiff's claim that Lemus acted with deliberate indifference to his serious medical need.  Accordingly, this Court **RECOMMENDS** that summary judgment be **GRANTED** in favor of Defendant Lemus.

### b.    Sergeant Griffin

Sergeant Griffin monitored the buy-bust operation that led to Plaintiff's arrest. According to his sworn declaration, Griffin observed Wilson stop Plaintiff and bring him to the ground. Griffin Decl. ¶ 5. Griffin observed the entire arrest, including Tagaban's strikes with her flashlight to Plaintiff's shoulder, and at no time did he hear Plaintiff complain of being injured or in pain. Id. ¶¶ 5-8. Once Plaintiff was subdued, Griffin drove Lemus past Plaintiff so that Lemus could identify him.  Id. ¶ 9.  Griffin did not observe any visible injuries to Plaintiff at this time. Id.  Griffin next saw Plaintiff after Plaintiff had been placed in a holding cell, at which point Plaintiff did not appear to have any visible injuries and was

---

[11]  Defendants' expert on law enforcement custodial practices and procedures explains in his declaration that "San Diego County Sheriff's Department Detentions medical staff nurses are required by Sheriff's Department policy & procedure to reject arrestees that have significant medical complaints until those individuals have been evaluated, treated and cleared by a contract medical facility."  Decl. of William Hogue Supp. Defs.' Mot. for Summ. J. ¶ 9.

walking around and moving his shoulders back and forth without any apparent pain or discomfort.  Id. ¶ 11.  Plaintiff also did not complain of being injured or in pain, or ask Griffin, the Sergeant on duty, for medical treatment.  Id. ¶¶ 11-12.  Once Plaintiff was booked, Griffin had no further contact with him.  Id. ¶ 13.  Plaintiff presents no evidence to contradict Griffin's sworn statement.

Plaintiff alleges that, as the supervisor, Griffin was informed of Plaintiff's request for treatment and also claims that Griffin was aware Plaintiff was injured because he witnessed the beating.  SAC at 6.  However, Plaintiff points to no evidence that Griffin was aware that Plaintiff allegedly asked someone else for medical treatment.  Nor does Plaintiff refute Griffin's declaration that, even though he witnessed Plaintiff's arrest, he did not observe any injuries on Plaintiff or detect that Plaintiff had any need for medical care.

In order to show that Griffin acted with deliberate indifference, Plaintiff must prove not only that Griffin was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" (i.e. that a serious medical need exists), but that Griffin actually drew that inference.  Lolli, 351 F.3d at  418-419.  This concept was fleshed out in Gibson, where the widow of a mentally ill detainee, who died in jail, alleged that deputies were deliberately indifferent to her husband's serious mental illness.  Gibson, 290 F.3d at 1180.  The deputies were not medically trained regarding the diagnosis and treatment of mental illness, and were not told that plaintiff had a mental condition.  Id. at 1196-97.  Even though the deputies had observed and commented on the man's dramatic mood swings, which were symptoms of serious mental illness, the court held that unless the detainee "was so obviously mentally ill" that the deputies, despite their lack of training, "must have known" that he was ill, they could not be found deliberately indifferent.  Id. Similarly, in Clouthier, the court held that unless the risk of serious harm to the detainee if he did not received medical care was "so 'obvious'" that the defendant "must have drawn an impermissible inference," there was insufficient evidence to survive the defendant's motion for summary judgment.  Clouthier, 591 F.3d at 1247.

///

Here, there is no evidence to support the contention that it was so obvious from the beating Plaintiff received that Griffin must have known Plaintiff was injured and in need of medical treatment.  Gibson, 290 F.3d at 1196-97; Clouthier, 591 F.3d at 1247.  Griffin did not observe any visible injuries on Plaintiff, Plaintiff did not tell Griffin or any other officer within earshot of Griffin that he was in pain, Plaintiff was able to stand by Wilson's police car following the beating, and Plaintiff walked around his holding cell soon after the beating and moved his shoulders around without any apparent signs of discomfort.  See Anthony, 853 F.2d at 743 (finding no deliberate indifference where plaintiff's injuries were not obvious to the defendants, defendants noticed no outward manifestations of the seriousness of plaintiff's internal injuries, plaintiff did not continue to complain of pain, and plaintiff did not become aware of permanent injuries resulting from accident until nearly two years later).  Further, Dr. Vilke explained that Plaintiff's later complaints of shoulder pain were typical after the use of a distraction technique, but that Plaintiff did not require any pain medication and did not exhibit any acute or chronic complaints when evaluated by a physician three days after his incarceration.  Vilke Decl. ¶ 16.  In sum, the Court finds that Plaintiff has not presented sufficient evidence such that a reasonable jury could find that Griffin was aware that Plaintiff was injured and in need of medical treatment.  If Griffin was not aware of Plaintiff's medical problems, he cannot be deliberately indifferent to them.[12]  Gibson, 290 F.3d at 1197.

Because Plaintiff has produced no evidence to indicate that Griffin was deliberately indifferent to his serious medical needs, this Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** with respect to Griffin.

### c.   Officers Wilson and Tagaban

Officers Wilson and Tagaban physically apprehended Plaintiff, and were with him from the time of his arrest on the street to the time of his placement in Vista Jail (the one

---

[12]  Also, like Lemus, even if Griffin saw a bump on Plaintiff's forehead or had other reason to suspect that Plaintiff was injured, Plaintiff has not demonstrated that any harm resulted from Griffin's failure to seek immediate medical care for Plaintiff.  Jett, 439 F.3d at 1096.

exception being when Officer Tagaban separately drove her car to the Central Jail). According to each officer's sworn declaration, at no time did Plaintiff complain to either officer of being in pain or ask either officer for medical treatment. Wilson Decl. ¶¶ 9-16; Tagaban Decl. ¶¶ 9-15. However, both officers heard Plaintiff complain of left shoulder pain to the Central Jail admitting nurse, the CMH nurse, Dr. Ramsey, and the Vista Jail nurse, and Tagaban observed the red bruises on Plaintiff's shoulder when the nurse at CMH moved Plaintiff's clothes to reveal them. Wilson Decl. ¶¶ 13, 14, 17; Tagaban Decl. ¶¶ 12, 13, 16. If Plaintiff did, in fact, have a bump on his forehead, both officers would have had the opportunity to observe it, given their close contact with him. Neither did so. Wilson Decl. ¶¶ 9 & 11; Tagaban Decl. ¶¶ 9-10.

Nonetheless, there is no evidence that Wilson and Tagaban's actions constitute deliberate indifference. As with Griffin, there is no evidence that it was so obvious from the manner in which Wilson and Tagaban apprehended Plaintiff that these officers must have known Plaintiff was injured and in need of medical treatment. Gibson, 290 F.3d at 1196-97; Clouthier, 591 F.3d at 1247. Neither officer reported seeing any visible injuries on Plaintiff prior to Plaintiff's being examined by the CMH nurse, Plaintiff did not tell either officer that he was in pain or needed medical attention, Plaintiff was able to stand by Wilson's police car following the arrest, and both officers observed Plaintiff moving his shoulders around on several occasions without any apparent signs of discomfort. See Anthony, 853 F.2d at 743. Further, even if Wilson or Tagaban saw a bump on Plaintiff's forehead or had other reason to suspect that Plaintiff was injured, Plaintiff has not demonstrated that any harm resulted from their failure to seek immediate medical care for Plaintiff. Jett, 439 F.3d at 1096; Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994) (citing Estelle, 429 U.S. at 104-05) (in order to overcome summary judgment, plaintiff must show that officers' minor delays in obtaining medical care for him caused substantial harm).

Unlike the other two officers, Wilson and Tagaban also personally delivered Plaintiff to multiple medical personnel and officers are expected to rely on the medical assessments of nurses and doctors. In fact, had the officers intentionally interfered with any treatment

prescribed by the medical staff, these actions could have been considered deliberate indifference. See Estelle, 429 U.S. at 104-05; Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) ("allegations that a prison official has ignored the instructions of a prisoner's treating physician are sufficient to state a claim for deliberate indifference").  But here, Plaintiff does not allege, nor provide any supporting evidence, that Wilson or Tagaban ignored the advice of medical staff, or that they interfered with any treatment once prescribed.  Rather, Plaintiff seems to argue that the Defendants had an additional duty to investigate his condition beyond relying on the recommendations of medical personnel. See Pl.'s Opp'n at 3-6.

While the parties have not directed the Court to a factually similar case in this Circuit, and this Court has found none, the Seventh Circuit has explained that lay officers are entitled to rely on the judgment of medical professionals.  In Hayes v. Snyder, 546 F.3d 516, 518-20, 527 (7th Cir. 2008), a prisoner suffering from severe testicular pain lodged several complaints with non-medical prison staff, stating that he was in pain and not receiving proper medical care.  The non-medical staff referred these complaints to medical officials, who responded that the prisoner did not require additional care.  Id.  The court held that while the medical staff may be responsible for their improper diagnosis,  the non-medical personnel were not deliberately indifferent when they relied on these medical judgments and they did not have a duty to further investigate the prisoner's claims.  Id. at 527.  The court noted that "the policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one."  Id.  The court further stated that "[a]t worst, they may have been negligent in failing to investigate further after receiving the summaries from the medical staff, but negligence is not deliberate indifference."  Id.

Here, Defendants similarly relied on the judgments of the examining medical personnel.  Three admitting nurses, an examining nurse, and a medical doctor all examined Plaintiff and none reported that Plaintiff required any treatment.  Wilson and Tagaban were entitled to rely on these determinations and had no independent duty to pursue additional

treatment for Plaintiff. <u>Hayes</u>, 546 F.3d at 527. Absent any evidence that they denied or delayed treatment, or interfered with prescribed treatment, they cannot be found deliberately indifferent. <u>Estelle</u>, U.S. at 104-05.

To the extent Plaintiff additionally suggests that Wilson and Tagaban are liable because these medical exams were not thorough, and were therefore ineffective (<u>see</u> Pl.'s Opp'n at 3-5[13]), Plaintiff's claim fails. Plaintiff has produced no evidence that the screening procedures at County Jail are systemically ineffective. Nor has Plaintiff produced evidence that any of the medical personnel who screened him are unqualified or untrained.[14] Without any evidence to support his claim that the treatment he received was in any way deficient or improper, or that Wilson or Tagaban were deliberately indifferent to his medical needs, summary judgment is appropriate. <u>See Celotex</u>, 477 U.S. at 323. Accordingly, the Court **RECOMMENDS** that summary judgment be **GRANTED** with respect to Wilson and Tagaban.

### d.   Conclusion

In sum, Plaintiff has not established that he suffered a serious medical injury or had a serious medical need or that any Defendant denied him medical treatment, unreasonably delayed any medical treatment, or ignored or interfered with a doctor's orders to provide medical treatment. Rather, Defendants have established that they promptly and repeatedly brought Plaintiff before the appropriate medical personnel. Thus, no question of material fact exists as to whether Defendants were deliberately indifferent to Plaintiff's serious medical need and no reasonable jury could find for Plaintiff on this issue. Accordingly, the Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** as to all Defendants.

---

[13] Plaintiff states that the intake nurses never physically examined him, and that Dr. Ramsey is only a psychiatrist, presumably rendering him incapable of treating physical injuries. Pl.'s Opp'n at 3-5.

[14] The Court further notes that Plaintiff's allegations that the medical screenings were inadequate would more properly be brought as a claim against the municipality. <u>See Clouthier</u>, 591 F.3d at 1249-50 (explaining that municipalities may be held liable for an injury resulting from the standard policy of a local government or from a failure to train).

**B.**   <u>**Qualified Immunity**</u>

Defendants argue that even if the Court found that Plaintiff had established sufficient evidence that the officers failed to provide him with medical care, they are protected by qualified immunity.  Defs.' Mem. at 13-16.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 638-40 (1987).  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001) (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)), *abrogated on other grounds by* <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808 (2009).  This privilege is "'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  <u>Id</u>. at 200-01 (quoting <u>Mitchell</u>, 472 U.S. at 526).  Thus, the Supreme Court "'repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'"  <u>Id</u>. at 201 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam)).

In <u>Saucier</u>, the Supreme Court established a two-step inquiry for determining whether an official is entitled to qualified immunity.  <u>Pearson</u>, 129 S. Ct. at 815-16; <u>Saucier</u>, 533 U.S. at 201.  First, the court was directed to consider whether, "'[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right."  <u>Saucier</u>, 533 U.S. at 201.  If a constitutional right would have been violated were the allegations established, the <u>Saucier</u> Court instructed lower courts to next examine whether the right was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Id</u>. at 201-02.  If an officer makes a reasonable mistake as to what the law requires - i.e. the right is not clearly established - the officer is entitled to immunity.  <u>Id</u>. at 205.  The Supreme Court subsequently determined that "while the sequence set forth [in <u>Saucier</u>] is often appropriate, it should no longer be regarded as mandatory."  <u>Pearson</u>, 129

S. Ct. at 818.  Instead, lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

Here, Plaintiff had a right under the Fourteenth Amendment to have a serious medical condition examined by medical personnel, and it has been clearly established that this right is violated when officers are deliberately indifferent to a serious medical need. Estelle, 429 U.S. at 104-05.  However, Plaintiff has presented no evidence that Defendants violated this right.  As discussed above, Defendants did not exhibit deliberate indifference to Plaintiff's condition. Defendants transported Plaintiff to appropriate medical facilities, including to CMH when Plaintiff voiced suicidal thoughts.  Plaintiff was examined on at least three separate occasions, Plaintiff was interviewed and monitored for injury or discomfort, and Plaintiff was physically examined by trained medical personnel who inquired about his condition and recorded his responses.  Furthermore, Defendants acted reasonably by relying on the statements of medical professionals as to Plaintiff's condition.  See Hayes, 546 F.3d at 527.  Because Plaintiff has not established that Defendants were deliberately indifferent to his serious medical condition, Defendants are protected by qualified immunity. The Court, therefore, **RECOMMENDS** that Defendants' motion be **GRANTED**.

**C.    Plaintiff's Motion for Return of Exhibits**

In a separately filed motion, Plaintiff asks that the Court order the Clerk to return the color photos of Plaintiff attached to his Opposition [ECF No. 159] as Exhibits E, F, G, and H because Plaintiff has no other copies and cannot obtain the same in prison.  ECF No. 160. Defendants have not objected to this request.

In light of the fact that Plaintiff is proceeding *pro se* and *in forma pauperis*, and because Defendants have no objection, this Court **RECOMMENDS** that the district judge **GRANT** Plaintiff's motion and order the Clerk to return Exhibits E, F, G, and H to Plaintiff.

///

///

///

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation, (2) granting Defendants' Motion for Summary Judgment, and (3) granting Plaintiff's Motion to Order Clerk to Return Exhibits.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties no later than **July 22, 2011**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 5, 2011**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

DATED:  July 1, 2011

BARBARA L. MAJOR
United States Magistrate Judge

08cv0408-WQH (BLM)